**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0589n.06

No. 13-5908

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Aug 04, 2014 |
| Plaintiff - Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| JUSTIN MICHAEL JAMES, | ) | |
| | ) | |
| Defendant - Appellant. | ) | |

Before: BATCHELDER, Chief Judge; and BOGGS and WHITE, Circuit Judges.

BOGGS, Circuit Judge. Justin James pleaded guilty to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). The district court applied what the Sentencing Commission's Guidelines Manual refers to as a "cross reference" and sentenced James in the same manner as if he had committed attempted second-degree murder. James argues that applying the cross reference was procedurally improper and that, even if it were proper, the district court lacked sufficient evidence to sentence James under the attempted-murder cross reference. James also argues that his sentence was substantively unreasonable. Because applying the cross reference was procedurally appropriate and because the district court carefully explained the evidentiary foundation for employing it, we affirm the district court's sentence.

1

I

A

At sentencing, the parties accepted the facts stated in James's presentence report.[1] On May 30, 2012, James was at the apartment of his girlfriend, Tabron Houston. While James was there, Percil Walls, also known as Pig, arrived. According to James, Walls had been fighting with Houston, and Walls kicked down Houston's apartment door, dragged her outside, and began punching, kicking, and choking her.[2] James stated that five minutes into Walls's attack on Houston, he ran toward Walls, who fled. According to James, he and several companions then left in a car for a store.

James stated that, while he was away, Houston called to inform him that Walls had returned and "busted" her window. According to James, he returned to check on Houston and saw Walls running from the broken window. James stated that he "kind of got out of the car window" on the passenger side and fired one shot "up in the air." The bullet struck a parked car.

The Memphis Police Department responded to a report of gunshots at Houston's apartment complex. Officers stopped and searched James's vehicle, which matched the description provided to them. In the trunk, officers found a black .40-caliber handgun and a loaded magazine.

---

[1] The United States Probation Office prepared the report using the 2012 edition of the United States Sentencing Commission Guidelines Manual.

[2] According to the government: "Officers learned from the domestic violence victim Tabron Houston that the defendant and his friends were at her apartment when her ex-boyfriend Percil Walls (hereinafter 'victim') arrived and physically assaulted her." Appellee Br. 5. Like the district court, we decline the government's invitation to refer to Walls as "victim." A best practice in federal litigation, even where the record supports an epithet, "is usually to lay out the facts and let the court reach its own conclusions." *Bennett v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 584, 585 (6th Cir. 2013).

Officers subsequently obtained a surveillance video of the incident. According to the presentence report, the video depicted a car entering the apartment complex and a man walking on the sidewalk. As the car approached the pedestrian, a man in the car climbed out of the front passenger window and fired a shot over the top of the car in the direction of the pedestrian. Several individuals ran from the scene. Officers identified James as the shooter in the video. James is a convicted felon.

B

On March 22, 2013, James pleaded guilty, without a plea agreement, to being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). His presentence report determined that U.S.S.G. § 2K2.1 provided the base offense level for the sentencing of offenses under 18 U.S.C. § 922(g). Because James had a prior felony conviction for either a crime of violence or a controlled-substance offense, his base offense level would have been 20, under § 2K2.1(a)(4). But the presentence report noted that § 2K2.1(c) instructs that a sentencing court should apply a "cross reference" if the defendant used a firearm in connection with the commission or attempted commission of another offense. The presentence report determined that James possessed a firearm in connection with attempted murder, and it therefore assigned him a base offense level of 27, under § 2A2.1(a)(2), the guideline applicable to attempted second-degree murder. After a three-level reduction for acceptance of responsibility under § 3E1.1, James's offense level was 24. The presentence report assigned James six criminal-history points, which corresponded to a criminal-history category of III. An offense level of 24 and a criminal-history category of III resulted in a guideline range[3] of 63–78 months for James.

---

[3] Here, we use the term "sentencing range" synonymously with "§ 5A guideline range," i.e., to describe the range derived from the Sentencing Table in § 5A that corresponds to a defendant's base offense level (factoring in any relevant adjustments) and criminal-history category before

3

On June 28, 2013, the district court held a sentencing hearing. At sentencing, James objected to the application of the cross reference of § 2A2.1(a)(2) for attempted second-degree murder.[4] The government provided evidence to support applying the cross reference. The district court found that the evidence supported applying the cross reference and stated its reasoning on the record.

At sentencing, the government objected to a three-level—rather than a two-level— reduction for acceptance of responsibility. The government's rationale was that "the government had to introduce witnesses and testimony" to justify applying the attempted-murder cross reference. The district court granted the government's motion for only a two-level acceptance-of-responsibility reduction. This resulted in a total offense level of 25 and a criminal-history category of III, which corresponded to a guideline range of 70–87 months. After allocution and analysis of the § 3553 factors, the district court sentenced James to 80 months of imprisonment.

On appeal, James argues that applying the § 2A2.1(a)(2) cross reference was procedurally inappropriate because the act of attempting second-degree murder does not facilitate the underlying violation of § 922(g)(1), i.e., being a felon in possession of a firearm. He also argues that the evidence was insufficient to show that he possessed the mens rea of intending to cause death, a necessary element of attempted murder. Additionally, James argues that his sentence is substantively unreasonable because it is longer than necessary to accomplish justice.

---

incorporating any relevant statutory minimum. *See United States v. Joiner*, 727 F.3d 601, 602 n.1 (6th Cir. 2013). This is the range determined after applying step 7 of U.S.S.G. § 1B1.1(a). We have held, however, that the term "applicable guideline range" is a term of art that refers to the range that results from applying all eight steps of § 1B1.1(a). *Id.* at 604–05.

[4] James also raised this objection prior to sentencing in his objections to the presentence report.

II

We review de novo a district court's legal conclusions underlying the guideline range chosen, and we review for clear error the court's factual findings. *United States v. Bolds*, 511 F.3d 568, 579 (6th Cir. 2007).

III

A. Application of the Cross Reference for Attempted Second-Degree Murder

1

James argues that the district court committed procedural error in determining his guideline range using the guideline for attempted second-degree murder. As in other cases interpreting the Guidelines, this case requires us to navigate the Manual's structure with a careful reading of its language.

The Guidelines Manual's statutory index specifies § 2K2.1 as the guideline section applicable to convictions under 18 U.S.C. § 922(g). U.S.S.G. app. A. This section assigns an offense level for a defendant convicted of unlawful possession of firearms. Ordinarily, defendants receive a base offense level of 20 if they possessed a firearm as a felon previously convicted of either a crime of violence or a controlled-substance offense. § 2K2.1(a)(4)(A). But § 2K2.1 also provides for a "cross reference," under which the sentencing court must apply U.S.S.G § 2X1.1 "[i]f the defendant used or possessed any firearm . . . in connection with the commission or attempted commission of another offense." § 2K2.1(c)(1)(A).[5] The Manual defines "another offense" as "any federal, state, or local offense . . . regardless of whether a criminal charge was brought, or a conviction obtained." § 2K2.1 cmt. n.14(C).

---

[5] This instruction contains a proviso not relevant in this case: it only applies "if the resulting offense level is greater than that determined" otherwise under § 2K2.1. § 2K2.1(c)(1)(A).

Section 2X1.1, in turn, assigns offense levels for offenses of attempt, solicitation, or conspiracy not covered by a specific offense guideline. § 2X1.1(b). This section, furthermore, contains its own cross-reference provision: "When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section," the sentencing court must apply *that* guideline section. § 2X1.1(c). Because § 2A2.1 expressly covers the offense of attempted murder, a sentencing court must apply that section rather than § 2X1.1(b). Under § 2A2.1, a defendant receives a base offense level of 27 for attempted second-degree murder. § 2A2.1(a)(2).

Additionally, § 1B1.3, titled "Relevant Conduct (Factors that Determine the Guideline Range)," restricts how a sentencing court may apply the Manual's various cross-reference provisions. The section provides, in relevant part, that "cross references . . . shall be determined on the basis of . . . all acts . . . that occurred during the commission of the offense of conviction." § 1B1.3(a)(1)(A).

James argues that his conduct does not satisfy the Manual's definition of "relevant conduct" because attempted second-degree murder is not a crime that *facilitates* a violation of § 922(g)(1), being a felon in possession of firearms. Under James's reading of § 1B1.3(a)(1), a sentencing court should ask "whether the conduct alleged *facilitated the defendant's completion of his or her criminal acts* that led to an indictment and conviction." Appellant Br. 17–18 (emphasis added). Under James's theory, his shooting the gun cannot be "relevant conduct" because he did not do so "*in an effort to complete the act* that led to his conviction." Appellant Br. 19 (emphasis added).

The problem with James's argument is that it imposes a restriction on "relevant conduct" that does not exist in the Manual. Nothing in the language of § 1B1.3 suggests that the alleged conduct must facilitate or further the underlying offense of conviction. And James points us to

no case that has so interpreted "relevant conduct." James cites *United States v. Mayle*, 334 F.3d 552 (6th Cir. 2003), in which we held that the sentencing court properly determined that a murder committed "in order to facilitate [a] fraud offense" was relevant conduct under § 1B1.3(a)(1). *Id.* at 564. Nothing in *Mayle* suggests, however, that the alleged conduct need *always* further the offense of conviction. In fact, even in *Mayle*, the dispositive finding for the court was that the murder "was conduct that occurred *during the commission of* the fraud offense," which is the actual language of § 1B1.3(a)(1). *Mayle*, 334 F.3d at 564 (emphasis added). James also relies on a statement in *United States v. Scolaro*, 299 F.3d 956, 957 (8th Cir. 2002): "The plain meaning of [§ 1B1.3(a)(1)] contemplates conduct taken prior to, and in order to facilitate, the charged offense." Again, nothing in *Scolaro* suggests that § 1B1.3(a)(1) *requires* that the relevant conduct facilitate the charged offense. Because James allegedly shot at Walls "during the commission of the offense of conviction"—i.e., while being a felon in possession of a firearm—the district court properly applied § 2A2.1(a)(2) as a cross reference for attempted second-degree murder.

2

James also argues that we "should not continue to allow defendants to be subjected to [the] practice" of being sentenced based on uncharged conduct. This view has support from some jurists. *See United States v. Booker*, 543 U.S. 220, 288 (2005) (Stevens, J., dissenting, joined by Souter & Scalia, JJ.) ("[I]ncreasing a defendant's sentence on the basis of conduct not proved at trial . . . is contrary to the very core of *Apprendi*. . . . [C]ertain applications of 'relevant conduct' sentencing are unconstitutional."); *United States v. Miller*, 910 F.2d 1321, 1331–32 (6th Cir. 1990) (Merritt, J., dissenting) ("Almost the entire spectrum of Fifth and Sixth Amendment rights granted to the accused are denied by the literal reading and enforcement of [the 'relevant

conduct' provision] because, according to its procedure, a defendant may never be informed of the specific charge against him until the probation report issues. . . . The real charge for which the defendant will be sentenced will be drawn up in the probation office, and the sentence will be imposed without the right of confrontation at the sentencing hearing by the court on the basis of hearsay information.").

These views, however, do not represent prevailing law. Our task on appeal is limited to considering whether the district court's application of the cross reference was correct under existing law. It is. The Manual itself states that under § 1B1.3(a)(1), the "relevant conduct" "focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense." § 1B1.3 cmt. n.1. And James himself recognizes that binding precedent forecloses his argument. *See* Appellant Br. 19. We have repeatedly held that the Manual allows uncharged conduct to form the basis for the base offense level and that such action is constitutional. *United States v. Shafer*, 199 F.3d 826, 830 (6th Cir. 1999) ("Our cases have interpreted the relevant conduct provision of § 1B1.3(a)(2) to include conduct of a criminal nature for which a defendant could not otherwise be held criminally liable."); *United States v. Davern*, 970 F.2d 1490, 1494 (6th Cir. 1992) (en banc) ("The law in this Circuit is clear that a base offense level is determined by the amount of drugs included in the defendant's relevant conduct, not just amounts in the offense of conviction or charged in the indictment."); *Miller*, 910 F.2d at 1327 (majority opinion); *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989); *see also United States v. Sanchez*, 527 F. App'x 488, 492 (6th Cir. 2013) ("Circuit precedent is clear: the use of a firearm is relevant conduct that can trigger § 2K2.1(c)(1)'s cross reference to

§ 2X1.1's enhancement provision even if the weapon used in the related conduct is different from the weapon that formed the basis for the § 922(g) offense," under certain circumstances.).

James argues, however, that the Supreme Court's recent decision in *Alleyne v. United States*, 133 S. Ct. 2151 (2013), calls into question the practice of sentencing defendants based on uncharged conduct. *Alleyne* held that "any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 133 S. Ct. at 2155. James correctly notes that *Alleyne* is not *directly* controlling because the Court's holding involved "facts that increase mandatory minimum sentences," *id.* at 2163, and that the conduct at issue in his case—attempted murder—did not increase a mandatory minimum sentence. *See* Appellant Br. 22. There is no statutory minimum sentence for the felon-in-possession offense. The government states that the rule of *Alleyne* does not apply to James because the use of the attempted-murder guideline in sentencing for the felon-in-possession offense was only an "enhancement" based on "a guideline provision, not a statutory provision." Appellee Br. 18. Sentencing James based on a finding of attempted murder rather than simply for the convicted offense, however, had the effect of more than doubling James's guideline range.[6] The government goes further, stating: "The *Apprendi* rule does not extend to guideline determinations that do not change the statutory range, as long as the district court considers the guidelines to be advisory and not mandatory." *Ibid.* The government, however, fails to contend head on with *Alleyne*, the Court's most recent statement on the *Apprendi* doctrine.

---

[6] The district court determined that James's guideline range was 70–87 months. If James's base offense level did not derive from the attempted-murder guideline, his base offense level under § 2K2.1 would have been 20. Assuming the district court would have again granted the same two-level reduction for acceptance of responsibility, James's total offense level would have been 18, resulting in a guideline range of 33–41 months.

It is true that *Alleyne* contains expansive language suggesting that the Court may be rethinking the precise contours of the *Apprendi* doctrine. "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact necessarily forms a constituent part of a new offense and must be submitted to the jury. *It is no answer to say that the defendant could have received the same sentence with or without that fact.*" *Alleyne*, 133 S. Ct. at 2162 (emphasis added). In *Alleyne*, the defendant was convicted of using a firearm in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A). The statute authorizes a sentence of five years to life; if the firearm is brandished, the authorized sentence is seven years to life. *See Alleyne*, 133 S. Ct. at 2155. In *Alleyne*, the sentencing court treated brandishing as a sentencing factor that it could find by a preponderance of the evidence, and it sentenced the defendant to seven years of imprisonment. *Id.* at 2156. The Court held that this was impermissible "because the legally prescribed range *is* the penalty affixed to the crime . . . [and] that a fact increasing either end of the range produced a new penalty and constitutes an ingredient of the offense." *Id.* at 2160. The dissent objected that the seven-year sentence could have been statutorily imposed, with or without a judicial finding of brandishing, because the jury's verdict alone authorized a sentence of five years to life. *Id.* at 2169–70 (Roberts, C.J., dissenting). For the majority, however, "this fact [was] beside the point," and it rejected this reasoning. *Id.* at 2162, 2162 n.3 (majority opinion).

Somewhat similar logic applies here. Sentencing James to 80 months of imprisonment is presumably permissible because the authorized sentence is up to 120 months. § 924(a)(2). The sentencing court could have legally imposed a sentence of 80 months of imprisonment, with or without applying the attempted-murder cross reference. Yet the *Alleyne* majority rejected this reasoning.

The advisory nature of the guidelines system may also not be a dispositive answer to James's claim. In another sentencing-law case last term, the Court recognized that the guidelines, *in practice*, at least drive, if not determine, a defendant's sentence. *See Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013). In *Peugh*, the Court held that sentencing a defendant under a version of the Manual promulgated after commission of the criminal act violates the Ex Post Facto Clause. *Id.* at 2078. In doing so, the Court acknowledged that in usual cases, a sentencing court will impose a within-guidelines sentence. *Id.* at 2083. "That a district court may ultimately sentence a given defendant outside the Guidelines range does not deprive the Guidelines of force as the framework for sentencing." *Ibid.* The Court recognized the reality that a sentence outside the guideline range is often unlikely.[7] *Id.* at 2083–84. The dissent objected that the "Guidelines do not constrain the discretion of district courts and, thus, have no legal effect on a defendant's sentence." *Id.* at 2089. The Court rejected this reasoning, at least for ex post facto purposes.[8] *See id.* at 2086–87.

Additionally, Justice Thomas, writing for four Justices in Part III-A of *Alleyne*, went even further, stating that a "well-established," early American practice was "including in the indictment, and submitting to the jury, *every fact* that was the basis for imposing or increasing punishment." *Alleyne*, 133 S. Ct. at 2159 (plurality opinion as to Part III-A) (emphasis added). Justice Thomas wrote: the "defendant's ability to predict with certainty the judgment from the face of the felony indictment flowed from the invariable linkage of punishment with crime." *Id.* at 2160 (quoting *Apprendi*, 530 U.S. at 478).

---

[7] "In less than one-fifth of cases since 2007 have district courts imposed above- or below-Guidelines sentences absent a Government motion." *Peugh*, 133 S. Ct. at 2084.

[8] The Court indicated that its holding in *Peugh* should not cast doubt on its Sixth Amendment sentencing cases because "the Sixth Amendment and *Ex Post Facto* Clause inquiries are analytically distinct." *Peugh*, 133 S. Ct. at 2088.

Although Justice Thomas's opinion carries some force here, we decline to extend *Alleyne* beyond its four corners for three reasons. First—and foremost—we believe that if the Court wished in *Alleyne* to create a sea change in sentencing practice, it would have said so expressly. Second, the *Alleyne* Court observed that its ruling "does not mean that any fact that influences judicial discretion must be found by a jury." *Id.* at 2163. Arguably, following the guidelines by referring to an uncharged offense does more than "influence" judicial discretion, but the point remains. Third, four post-*Alleyne* unanimous panels of this court have taken for granted that the rule of *Alleyne* applies only to mandatory minimum sentences. *See Rogers v. United States*, 561 F. App'x 440, 443 (6th Cir. 2014) (unpublished) (district court did not violate defendant's Sixth Amendment jury-trial right when it applied a cross reference to the attempted-murder guideline because *Alleyne* does not "require that every fact giving rise to [a] cross-reference in [a] guidelines calculation be submitted to a jury and found beyond a reasonable doubt."); *United States v. Harris*, 552 F. App'x 432, 440 n.4 (6th Cir. 2014) (unpublished) ("The judicial fact-finding here did not affect the statutorily authorized penalties, so *Alleyne* is not implicated."); *United States v. Cook*, 550 F. App'x 265, 275 (6th Cir. 2014) (unpublished) (*Alleyne* does not require reversal of sentence because "[n]o statutory mandatory minimum applied to his convictions for being a felon in possession of a firearm."); *United States v. Johnson*, 732 F.3d 577, 584 (2013) ("*Alleyne* did not extend *Apprendi* to facts that do not increase the prescribed statutory penalties." ). Although it may be troubling to some that the Guidelines Manual instructs sentencing courts to substitute the cross-referenced offense for the conduct actually charged, effectively resulting in an enhanced sentence for a completely different offense, having closely considered *Alleyne*'s language, we now affirm our pre-*Alleyne* holdings that a sentencing court may determine an offense level by cross-referencing a guideline for an uncharged offense.

Until the Supreme Court directly revisits this issue, the best practice is to remain within the four corners of *Alleyne*. Accordingly, applying the attempted-murder cross reference was proper.

## B. Sufficiency of the Evidence

James also argues that there was insufficient evidence for the district court to find that he possessed the requisite mens rea to commit attempted murder. James correctly states that at common law, "[a]lthough a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991); *accord Merritt v. Commonwealth*, 180 S.E. 395, 399 (Va. 1935) ("To commit murder, one need not intend to take life; but to be guilty of an attempt to murder, he must so intend. It is not sufficient that his act, had it proved fatal, would have been murder."). For the district court to employ the attempted-murder cross reference, it needed to find by a preponderance of the evidence that James intended to kill Walls. *See United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006).

At the sentencing hearing, James accepted the facts in the presentence report but objected to the government's determination that the facts constituted attempted murder. James admitted that, consistent with the presentence report, he shot "in the air" but that the bullet hit a parked car. The government characterized the facts differently and argued that James shot the gun with the intent to kill Walls. The district court did not simply accept the government's characterization. It stated: "If there's an objection . . . with respect to the facts, whether or not the facts amount to  . . . an attempt[ed] murder, I would have to receive some proof on that to make the final decision." The district court also stated that James's objection "shift[ed] the burden of proof really on the government" and that the government was "going to have to prove" attempted murder.

13

At James's sentencing, the government called three witnesses, and James cross-examined each. The government also introduced the surveillance video into the record. At the close of evidence, the district court afforded both the government and James an opportunity to argue their positions in light of the evidence presented. James argued that the evidence did not prove a specific intent to kill. The district court detailed the evidence in the record and concluded that James possessed the intent to kill. It stated:

> The video was just compelling. It is just obvious. . . . [I]t's obvious on the video what [James] does. It's compelling. He is on the side of the car away from [Walls]. He comes out of the window, and y'all correct me if I am wrong, but this is what I saw on the video, he comes out of the window, actually looks like he sits on the door with his arm over the top of the roof of the car aiming across towards where [Walls] is.

Additionally, the district court addressed and rejected James's characterization that he shot "in the air." It stated:

> Shots fired, not in the air – yes, any shot goes in the air, so I guess – technically, I guess it was shot in the air, but . . . when you shoot in the air, you are shooting upward. And his arm is laying on the roof of the car in the direction of where the ex-boyfriend was, and [a shot is] fired, and it hits an SUV. It doesn't hit the roof of a building. It doesn't hit the upstairs window of a building or a tree, it hits a vehicle parked on the driver's side.

James argues that the district court's language suggests that it found that he acted recklessly toward *others* and not specifically toward Walls, which would be insufficient to support attempted murder. Appellant Br. 25. James highlights the following statement by the district court:

> I also make note that when that car came around there and shots fired, all the other people that were out there ran for their lives. I don't know if y'all noticed that. The two guys that were on the side of the building, they ran for their lives because they knew what was happening, and so just based on the proof that was presented and that video, I'm sorry, at least there was an assault with an intent to commit a second degree murder.

14

*Ibid.* James quotes this statement out of context. In context, it is evident that the district court described the reaction of bystanders chiefly as evidence that James fired the gun *parallel to the ground*, such that the shot could have hit Walls, and not, as James argued, "into the air." James also notes that the presentence report lists "society" as the victim of his offense. But there is no evidence that the district court placed any weight on this. The district court's finding that James had the specific intent to kill Walls was not clear error. The district court's review of the evidence was thorough and nuanced.

## C. Substantive Reasonableness

James argues that his 80-month sentence overemphasized the seriousness of the offense because the application of the attempted-murder cross reference, along with the district court's emphasis on the seriousness of the offense in its § 3553(a) analysis, resulted in impermissible "double-counting [of] James['s] offense conduct." Appellant Br. 30.

We review the substantive reasonableness of a defendant's sentence "under a deferential abuse-of-discretion standard*." Gall v. United States*, 552 U.S. 38, 41 (2007).

As noted, the district court determined that James's guideline range was 70–87 months. The district court stated that it must consider the sentencing goals provided in 18 U.S.C. § 3553(a). The court afforded a chance to speak to James, his counsel, and the prosecutor. The court specifically considered "the history and characteristics of the defendant involved,"; James's "criminal history . . . [which was] not the worst criminal [history] I have seen," *ibid.*; James's background, upbringing, and family; James's "physical condition,"; his "mental and emotional health,"; his education; employment history; and the seriousness of the offense and the need to promote respect for the law.

15

Because James's sentence was within the guideline range, we apply a "presumption of reasonableness." *United States v. Vonner*, 516 F.3d 382, 389 (6th Cir. 2008) (en banc); *accord Gall*, 522 U.S. at 51; *Rita v. United States*, 551 U.S. 338, 347 (2007). James has not overcome this presumption. "The fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *Gall*, 522 U.S. at 51.

James argues the sentence is unreasonable because the sentence double counts his conduct, i.e., shooting at Walls. But no impermissible double counting occurred. The district court did not depart upward from the sentencing range, and the sentence imposed was near the mid-point of the guideline range. James also faults the district court for failing to compare his sentence to those of other defendants convicted of the same crime under similar circumstances. There is no requirement that a sentencing court conduct a side-by-side comparison on the record. "[T]he district judge should . . . consider all of the § 3553(a) factors," *Gall*, 552 U.S. at 49–50, but it need not "refer explicitly to each of the statutory sentencing factors when imposing a sentence," *United States v. Simmons*, 587 F.3d 348, 358 (6th Cir. 2008). Because the district court did not abuse its discretion in sentencing James to a within-guidelines sentence of 80 months, we find that the sentence is substantively reasonable.

IV

The district court properly applied the attempted-murder cross reference because "relevant conduct," under § 1B1.3(a), need not facilitate the underlying offense. It need only "occu[r] during the commission of the offense of conviction." § 1B1.3(a). Additionally, *Alleyne* does not alter our long-established holding that a defendant may be sentenced for uncharged conduct. We, therefore, AFFIRM the district court's sentence.